Leo L. Lowy v. Commissioner.
Lowy v. Commissioner
Docket No. 11085.
United States Tax Court
T.C. Memo 1957-77; 1957 Tax Ct. Memo LEXIS 175; 16 T.C.M. (CCH) 333; T.C.M. (RIA) 57077; May 15, 1957
*175 Richard W. Wilson, Esq., for the petitioner. John J. Madden, Esq., and James J. Quinn, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in the petitioner's income tax for the years 1941 and 1942, income and victory taxes for the year 1943, and made additions to the tax as follows: Addition to Tax
Year
Deficiency
Section 293(b)
1941
$ 1,909.16
1942
47,808.39
$23,904.19
1943
65,009.92
32,504.96
The issues for decision are whether the petitioner received additional income during the years 1941, 1942 and 1943 in the amounts of $9,836.76, $74,272.77 and $88,814.10, respectively, which he failed to report on his tax returns, and if there was such an omission of income, whether any part of it was due to fraud with intent to evade tax. Findings of Fact Some of the facts and exhibits pertaining thereto are stipulated. They are incorporated herein by this reference. The petitioner, Leo Lowy, is an individual residing in New York City, New York. His tax returns for the years in question were filed with the collector of internal revenue for the third *176 district of New York. Since 1927, except for two brief periods, 1932-1933 and a portion of World War II, Lowy has been engaged in the business of manufacturing ball and roller bearings in the United States. Prior to that time he had manufactured and sold bearings in Germany. In 1927 Lowy decided to build a bearing factory in the United States. He opened a small experimental shop in New York City and began to design, build and purchase machinery and other equipment for his projected factory. The machinery was stored in various warehouses in the vicinity of New York City and Newark, New Jersey, or at Lowy's small shop. During the period 1927 to 1931 Lowy manufactured tapered roller bearings which he stored in wooden cases. In April 1930, Lowy formed a Delaware corporation called Tapered Roller Bearing Co., Inc., to manufacture bearings with the equipment he had assembled in the previous years. Lowy transferred to that corporation part of the machinery and tools which he had collected since 1927. Tapered's tax return for 1930 showed an opening inventory of $300,000 and machinery and equipment of $700,000. Lowy signed Tapered's 1930 income tax return, which he swore had been examined *177 by him and to the best of his knowledge and belief was a true and complete return made in good faith. Tapered's tax return for the year 1930 showed gross sales of $32,680.08 and a loss of $91,637.35. In 1931, Tapered began to have serious financial difficulties and Lowy began to borrow to maintain the operation. He obtained loans from Theodore Smith, who was the president and principal stockholder of John Hassall, Inc., a manufacturer of nails located in Brooklyn, New York. In October 1931, Lowy executed a chattel mortgage on behalf of Tapered to John Hassall, Inc., on account of an indebtedness of $57,250. The chattel mortgage covered machinery, fixtures, and equipment owned by Tapered with an indicated value of $707,237. Tapered defaulted on the mortgage and Hassall foreclosed on May 3, 1932, and took possession of all the machinery and equipment and moved it to the Hassall factory in Brooklyn. With this foreclosure Tapered apparently disappeared. On May 5, 1932, Tapered made a general assignment for the benefit of its creditors. On May 24, 1932, Lowy's wife, Evelyn, purchased at public auction, for $1,625, Tapered's stock of roller bearings which it had assigned. Evelyn made *178 a $400 deposit on the purchase. Thereafter on May 25, 1932, Lowy and Kramer, an attorney, approached Harold Bock, who bought and sold auction goods, and made an agreement with him whereby he was to pay the remaining $1,225 to the auctioneer, receive a bill of sale therefore, and subsequently in five or ten days resell the bearings to Lowy at a profit of $500 or $1,000. Lowy told Bock that the real worth of the bearings was $100,000 and that the low auction price was due to a false rumor that the bearings were inferior because they were not properly hardened. Bock purchased the bearings from the auctioneer, received a bill of sale therefor, and permitted the bearings to remain at Tapered's place of business. The bearings remained there for two months while Lowy tried unsuccessfully to raise the money to repay Bock. Bock then moved the bearings to a store on DeKalb Avenue in Brooklyn and subsequently sold some of the bearing on credit. On April 6, 1933, Evelyn sued Bock in the Supreme Court of New York, claiming that Bock loaned her the money to buy the bearings at a usurious rate of interest and that therefore the loan transaction was void; that she was entitled to possession of the *179 bearings; that Bock account for the bearings sold by him; and that she have judgment against Bock for $100,000. Evelyn received a judgment by default in spite of Bock's claim that the Court did not have jurisdiction since he allegedly had never been served with a copy of the summons or complaint. Lowy subsequently repossessed the bearings and received an assignment of the accounts receivable for bearings sold by Bock. Lowy also agreed to repay Bock $1,200 which sum he paid to Bock in part. On May 7, 1932, Lowy's creditors petitioned him into personal bankruptcy. In this action, Lowy executed an oath on July 22, 1932, stating that he had no real or personal property except his clothes, and the capital stock of the Riebe Ball Bearing Company, which was then declared by him to be worthless. Lowy was never discharged in bankruptcy. Sometime in 1933, the bankruptcy proceeding was closed, Lowy having satisfied or compromised the claims of his creditors. Lowy was without funds in 1933 and was attempting to go into the business of reconditioning old bearings. He advised Gustave Garfield, who had been his attorney during part of 1931 and prior thereto, that if he could get a small amount *180 of cash he could secure possession of Tapered's bearings, which were worth a large amount of money. After investigating the situation Garfield made an agreement with Lowy that he would help him recover Tapered's bearings in consideration of a 50-50 sharing of the profits made on the subsequent sales of the bearings. Since Lowy had never been discharged in bankruptcy, they agreed that Garfield would take title of the bearings and Lowy would act as his agent in selling them. During 1933, through Garfield's efforts, 100 cases of Tapered's bearings which had been seized by warehousemen outside of the New York area for failure to pay storage charges were recovered at a cost of $1,300 to Garfield. Approximately 300 cases of bearings and certain machinery were stored in a warehouse in Newark were recovered at a cost of $1,000 to Garfield. He received bills of sale from the warehousemen for the above mentioned bearings. Lowy sold approximately 15 cases of bearings and repaid Garfield $2,300 from the proceeds. Garfield also filed suit against Bock, with Evelyn as plaintiff, and the bearings in his possession were recovered as discussed above. The Paragon Trading Company, one of Tapered's *181 creditors, purchased certain assets, including bearings and accounts receivable, of Tapered at the public auction following Tapered's general assignment for the benefit of creditors. Subsequently Paragon made an agreement with Lowy whereby he was to sell bearings and/or collect accounts receivable held by Paragon and turn over the proceeds to Paragon until Paragon received an amount which equalled Tapered's indebtedness to it plus an additional $1,500 and an amount not to exceed $200 to reimburse Paragon for expenses incurred by it in the course of collecting the accounts it held, at which time Lowy was to receive all of the assets of Tapered which Paragon then held. Lowy carried out the agreement and subsequently received an unknown quantity of bearings from Paragon. The only bearings which Lowy had in his possession in 1933 and 1934 were those which he recovered with the assistance of Garfield, as mentioned above. His basis in these bearings was $5,600, computed as follows: Deposit on "Bock" bearings
$ 400
Paid or owed to Bock
1,200
Paid to Garfield
2,300
Paid to Paragon
1,700
$5,600
In the latter part of 1933 or early part of 1934, Lowy took possession *182 of all but 21 cases of the bearings which he and Garfield had recovered so that he could use them as security for a loan of $100,000 which he attempted to obtain from Zipser. Shortly thereafter Lowy told Garfield that Zipser had a metallurgist examine the bearings and it was found that all of the bearings were worthless since they were not case hardened and that therefore the bearings in his possession should be junked. Garfield did not junk the 21 cases of bearings which he held, but subsequently removed them to his brother's garage. In 1942 Garfield's brother's wife sent him a storage bill of $600 for the bearings stored in the garage and then attached the bearings and started suit to foreclose them, without giving notice to Garfield. The judge in the case, in order to best serve the ends of justice, stayed the case and wrote a letter to Garfield informing him of the suit. Garfield forwarded the letter to Maurice Seligson, who as his law partner from 1925 to 1939 claimed an interest in the bearings, with a note appended to it which said, "Just received this a.m. These bearings are extremely valuable. Protect yourself. Make a copy and return orig." Garfield defended the law suit *183 and won the case by default. The subsequent disposition of the 21 cases of bearings or their present whereabouts is unknown to Garfield. In 1934 Lowy obtained permission from Hassall to use some of the machinery and equipment which it had taken in foreclosure from the Tapered plant. He set this machinery and equipment up in Hassall's factory in Brooklyn and began manufacturing tapered roller bearings. He manufactured and sold bearings in his individual name from this location during the period 1934 through 1937. On December 24, 1937, Lowy formed the American Rolbal Corporation. He was its sole stockholder. The merchandise inventory transferred to Rolbal by Lowy was valued on Rolbal's books as of January 1, 1938 at $12,657. The machinery and equipment it used was that which had been owned by Tapered and foreclosed by Hassall. Rolbal operated, as Lowy had, as an individual, from space in Hassall's factory. In 1940 Hassell required Lowy to move Rolbal's operations because the space it occupied was needed. Rolbal leased space on Flushing Avenue in Brooklyn and moved its operation from Hassall's plant. During the period 1934 through 1943 bearings were shipped to customers on Saturday *184 of each week. These shipments included bearings manufactured during the week as well as bearings which Lowy had in stock, i.e. those bearings which Lowy acquired in 1933 and 1934 with the help of Garfield. The bearings manufactured each week were manufactured by Lowy prior to 1938 and by Rolbal subsequent to 1938. During the war years Rolbal also manufactured and sold airplane parts. All sales of bearings, either manufactured or stock, were made under the name of Leo L. Lowy, during the period 1934 through 1943. Lowy had no production records for Tapered's bearings which he recovered with Garfield's help. He did have production records for those bearings which he and Rolbal manufactured from 1934 through 1943 and he also had sales records for all bearings sold by him from 1934 through 1943. Since each bearing had a serial or list number, Lowy could determine, by a process of elimination, whether the bearings he sold were manufactured or stock bearings. Lowy's sales of bearings determined by the above mentioned process, for the years 1938 through 1943, were as follows: Manufactured
Stock
Year
Bearings
Bearings
1938
$ 46,909.76
$ 51,481.81
1939
53,014.33
42,101.68
1940
91,288.60
86,777.23
1941
36,617.75
40,258.53
1942
20,042.40
9,754.11
1943
2,953.93
$247,872.84
$233,327.29
*185 Lowy did not report as income the proceeds of the bearings sales for the years 1941, 1942 and 1943. Leterstone Sales Company of Chicago bought most of the bearings that Lowy sold between 1934 and 1943. In the early part of 1941 additional financing was necessary to continue the operations of Rolbal. Through contacts he had with officials of Leterstone Lowy was introduced to Seymour Bernstein of the Merchants Acceptance Corporation of Chicago. Lowy invited Bernstein to New York in March of 1941 for negotiations. Bernstein went to New York and it was determined that M.A.C. would advance $20,000 for four months to Rolbal in consideration of a "bonus" of $6,000, plus interest. Bernstein would lend at these rates only to Rolbal, a corporation, and not to Lowy, an individual, to avoid any question of usury. In 1941, 1942 and 1943, Lowy borrowed $146,878.66, $451,350 and $610,900, respectively, from Hassall with which to meet weekly payrolls. Repayments of the loans were made by Rolbal from the proceeds of its sales. Rolbal reported sales on its 1941, 1942 and 1943 tax returns as follows: 1941
Sales - Jobbers
$ 68,698.62
- General
224,487.56
$ 293,186.18
1942
Sales - Bearings
$ 27,868.31
- General
1,074,453.88
$1,102,322.19
1943
Sales - Net
$1,255,755.82
$1,255,755.82
*186 Rolbal filed a certificate of corporate dissolution with the Secreary of the State of New York on May 10, 1943. Publication of the notice was made in a newspaper of general circulation in New York. However Rolbal continued to operate as a corporation and its 1943 tax return was filed as through the corporation had been in existence for the entire calendar year. During the years in issue, Rolbal's books were kept by a bookkeeper with occasional guidance and supervision from outside certified public accountants. Until 1943, Michael Liebovitz and his sister were the accountants. Following their departure in May 1943, Rolbal did not retain another accountant until the early part of 1944 for assistance in preparation of the 1943 return. In entering transactions in Rolbal's cash disbursements book, the check stubs and invoices were considered the primary sources of information. Invoices were frequently not available, however, and check stubs were relied on for information concerning most transactions. If the information on the stubs was ambiguous, the accountant would question Macklyn Weiss or Rosa Stammreich, who were employees of Rolbal, or Lowy himself. In many cases, Lowy's word *187 was taken as authority for the nature of the expenditure. The checks were not often compared with the stubs. In the following schedule, various checks drawn by Rolbal in 1942 and 1943 are listed. These checks were signed by Lowy and were paid to various merchants for the personal items indicated or were deposited in personal bank accounts and charged to Rolbal's various expense accounts as shown: Check
1942
Account
Date
No.
Payee
Amount
Article Purchased
Charged
2/24
4387
B. Altman & Co.
$ 603.48
Unknown
Maintenance
3/2
4424
Geo. Harris, Inc.
415.00
Jewelry
Supplies
3/2
4513
J. Sloves
270.00
Tea set
Supplies
3/2
4995
J. Sloves
278.00
Dining room silver
Supplies
set
3/24
4609
C. P. Paul
1,212.00
Piano
Maintenance
5/25
4922
Helen Weiss
500.00
Maintenance
6/27
5130
W. & J. Sloane
28.28
Unknown
General Expense
7/9
5225
Ethel Weiss
100.00
Mahogany desk
Maintenance
8/4
5511
H. Sacks & Sons
485.35
Breakfront
Maintenance
11/21
5485
H. Sacks & Sons
127.05
Furniture
Factory Supplies
10/1
1051
Zinn's Fur Shop
550.00
Mink jacket
Maintenance
11/12
1061
Cash
1,105.00
Deposited in Corn
Maintenance
Exchange Bank
personal account
11/12
5900
B. Altman & Co.
257.55
Furniture
General Expense
Total
$5,931.71
1943
3/5
Zinn's Fur Shop
$ 250.00
Silver fox skins
General Expense
3/5
Geo. Harris, Inc.
130.00
Jewelry
General Expense
3/12
6979
B. Altman & Co.
106.90
Deposited in
General Expense
account
5/13
1491
Cash
6,200.00
Jewelry
Factory Supplies
Total
$6,686.90
*188 Lowy did not report as income on his 1942 and 1943 tax returns any of the above mentioned amounts spent by Rolbal on personal items for himself or his wife or any of the above mentioned amounts deposited in his personal bank account. In March 1942, Evelyn arranged for the purchase of a piano from Charles W. Paul, a New York dealer. The purchase price, including tax, was $1,212. The purchase agreement was approved by Lowy. The agreement provided that the piano was to be delivered to the Lowy residence on Riverside Drive. The piano was paid for by a Rolbal check signed by Lowy. The check stub showed in Lowy's handwriting that the payee of the check was the "Paul Cont. Company." This disbursement was entered in Rolbal's cash disbursements book as a payment to the "Paul Contracting Company," and was charged to factory maintenance. The bookkeeper who made the entry relied on the information on the check stub in entering the disbursement. In 1942, Evelyn purchased a mink jacket from Zinn's Fur Shop, New York City. The price was $550 and was paid by a Rolbal check signed by Lowy. The check stub for this check indicated, in Lowy's handwriting, that the payee was "Zinn's Machine Company. *189 " The bookkeeper who entered this withdrawal in Rolbal's cash disbursements book charged the item to factory maintenance. In March 1943, Evelyn purchased a scarf of two silver fox furs from the same furrier at a cost of $250. The purchase price was paid with a Rolbal check signed by Lowy. The related check stub was marked "Zinn Fur's" in Lowy's handwriting and was entered by the bookkeeper in Rolbal's cash disbursements book as a charge to general expense. In March 1942, Lowy purchased a diamond and platinum fancy pin from Geo. Harris, Inc., jewelers, for a price of $415. The price was paid with a Rolbal check signed by Lowy. The check stub for this check was marked simply "Harris" and the item was entered in Rolbal's cash disbursements book under the account "supplies." In March 1943, Lowy purchased unidentified jewelry from Harris at a cost of $130. Payment therefor was made with a Rolbal check signed by Lowy. The stub showed "Geo. A. Harris, Inc." in Lowy's handwriting and was entered in Rolbal's cash disbursements book under the heading "General Expense." In May 1943, Lowy purchased from Harris a four-karat diamond solitaire lady's platinum ring and a fivekarat emerald-cut diamond *190 lady's platinum ring at a cost of $6,200. These were paid for by a Rolbal check drawn to "Cash," signed by Lowy and approved, by endorsement, for cashing by Lowy. [1] The check stub, in Lowy's handwriting, bears the legend "Geo. Harris, Inc., Dies and jigs for job #121214." This disbursement was charged on Rolbal's books to "factory supplies." In March 1942, Evelyn Lowy purchased a six-piece sterling tea set and sterling tray from Joseph Sloves, jewelers, New York City, at a cost of $270. Payment therefor was made with a Rolbal check signed by Leo L. Lowy. The check stub, in Lowy's handwriting, indicates the payee as "J. Sloven." The item was charged to factory supplies on Rolbal's books. In 1942, Rolbal lent the Candida Press $2,588 and, in 1943, $9,721. These loans were made through checks of Rolbal signed by Leo L. Lowy. These loans were charged to "printing expense" on Rolbal's books. Periodic repayments were made by Candida during 1942 and 1943. When a group of these repayments on Candida's checks reached $6,600, Lowy returned the *191 checks to Abraham Broadwin of Candida and requested a single certified check for that amount. Broadwin complied and the check for $6,600 dated May 6, 1943, was deposited in Lowy's personal bank account. Rolbal's books never reflected repayment of the loans. The balance of the loans due Rolbal was never repaid. Lowy did not report as income on his 1942 and 1943 tax returns the $6,600 which he received from Candida and deposited in his personal bank account. In 1942, Rolbal sold scrap metal in the amount of $14,281.47 to the firm of Jakob & Seligmann and Jacob Cohen. In 1943, scrap sales to those firms amounted to $5,079.87. The purchasers paid Lowy personally for the scrap. The payments were deposited in Lowy's personal accounts, or in his wife's accounts. The proceeds from the sale of scrap were never reflected in Rolbal's books nor reported as income. Lowy did not report as income on his 1942 and 1943 tax returns the $19,361.34 which he received from the sales of Rolbal's scrap metal and which he deposited in his or his wife's personal bank account. It was the practice of Lowy to draw Rolbal checks for payroll purposes in excess of the amounts necessary to meet the payroll. *192 For example, if the payroll for a certain period was $10,000, Lowy might draw the payroll check for $12,000 or $14,000. Lowy used some of the excess monies to purchase War Bonds for himself or his wife. It was a practice of Lowy personally to distribute to his employees their weekly pay envelopes. Lowy reported net income subject to income taxes on his 1941, 1942 and 1943 tax returns in the amounts of $2,750, $8,084.08 and $7,080, respectively. He reported net income subject to victory taxes on his 1943 tax return in the amount of $10,000. The Commissioner determined that Lowy received additional income subject to income taxes for the years 1941, 1942 and 1943, in the amounts of $9,836.76, $74,272.77 and $88,814.10, respectively. He also determined that Lowy received additional income subject to victory taxes for the year 1943 in the amount of $88,775.97. He explained his adjustments as follows: 1941
(a) To include in income the follow-
ing items received from American
Rolbal Corporation: Cash withdrawals charged to cor-
porate expense
$ 8,600.00
Social security taxes deducted
from employees not recorded on
corporate books
1,236.76
Total
$ 9,836.76
1942
(a) To include in income interest re-
ceived on savings bank deposits
$ 9.51
(b) To include in gross income the
following items received from
American Rolbal Corporation: Exchange check to United Air-
lines charged to expense
$ 944.70
Cash withdrawals charged to cor-
porate expense
34,959.32
Repayment of loans from Para-
gon Trading Corporation incor-
rectly credited to cash fund ac-
count on corporate records
10,000.00
Social security taxes deducted
from employees not recorded on
corporate books
4,063.06
Personal loans to Candida Press
charged to expense
2,588.00
Personal expense charged to cor-
porate expense
7,426.71
Corporate income from scrap
sales personally diverted
14,281.47
Total
$74,263.26
1943
(a) To include interest on savings
bank account
$ 38.13
(b) To include as income the follow-
ing items received from American
Rolbal Corporation: Cash withdrawals charged to cor-
porate expense
$63,352.52
Personal loans paid by corpora-
tion and charged by it to ex-
pense
9,721.00
Personal expense items paid by
corporation and charged by it
to expense
6,686.90
Erroneous 1942 corporate expense
accrual received in 1943
3,935.68
Corporate income from sales of
scrap personally diverted
5,079.87
Total
$88,775.97
*193 The deficiencies for the years 1942 and 1943 were in part due to fraud with intent to evade tax. Opinion The Commissioner determined that Lowy received additional income in 1941, 1942 and 1943, in the amounts of $9,836.76, $74,272.77 and $88,814.10, respectively and that the deficiencies for 1942 and 1943 were at least in part due to fraud with intent to evade tax. He contends that Lowy was siphoning off the surplus of Rolbal without burdening himself with the appropriate tax consequences. Lowy contends that the amounts which he received from Rolbal and which the Commissioner has included in his income were either reimbursements for loans made by him to Rolbal or for expenses of Rolbal paid by him from his own funds. Lowy's explanation of his tax affairs, as derived from his testimony, is condensed in the following paragraph. Between 1927 and 1931 Lowy manufactured bearings and stored them in wooden cases. In 1930 he was approached by certain promoters who offered to put up $50,000,000 with which a corporation could be formed and bearings manufactured on a large scale, with Lowy contributing his assets and services. Lowy agreed and a corporation, Tapered Roller Bearing Co. *194 , Inc., was formed, but the $50,000,000 capital never materialized. Tapered never manufactured any bearings and had no inventory, though its first tax return, prepared by one of the promoters, showed an opening inventory of $300,000. Lowy admitted signing the return though he knew it to be false. In 1932 Tapered's machinery was foreclosed and its assets assigned for the benefit of creditors. About the same time Lowy was petitioned into bankruptcy, which proceeding was closed in 1933, Lowy never being discharged in bankruptcy. In 1934 Lowy started manufacturing bearings again. He tried to raise capital by borrowing on the bearings he had in storage, but couldn't get a loan. As an alternative he started selling bearings to the Leterstone Co. in Chicago at about one-half of their original cost. In 1938 and 1939 he sold jewelry belonging to himself and his wife and also a piano from his home, the proceeds of which he loaned to the American Rolbal Corporation, a corporation which he formed at the end of 1937, for the purpose of securing a loan which he could not get as an individual, i.e. the rate of interest on the loan would have been usurious to an individual but not to a corporation. *195 Lowy considered himself and Rolbal to be one and the same and did not distinguish between the two. All bearings were sold under Lowy's name, though the sales were reported in Rolbal's tax returns. Rolbal kept the proceeds from the bearing sales, which Lowy considered to be loans to Rolbal. During the taxable years Lowy also spent a great deal of his own cash for Rolbal's expenses, i.e. $18,900 for vacation pay of employees; $56,000 for employee bonuses; $10,000 for employee recreation; $42,000 for business travel and entertainment; and $48,000 for miscellaneous corporate expenses. We think that the essential parts of Lowy's story are unsupported by the record and except as hereafter noted that he has not sustained his burden of showing that the Commissioner's determination is improper. Lowy was in the habit of drawing payroll checks on Rolbal's bank account in amounts exceeding its payroll. For example, if the payroll for a certain period was $10,000, Lowy might draw the payroll check for $12,000 or $14,000. He testified that the excess was used to pay petty cash expenses and his business expenses of travel, entertainment, etc. He admitted that some of the excess monies were used *196 to buy War Bonds for himself or his wife. The Commissioner determined that Lowy received income in 1941, 1942 and 1943, as a result of withdrawals of cash from Rolbal in the amounts of $8,600, $34,959.32 and $63,352.52, respectively. Lowy contends that those amounts were either reimbursements to him for loans made to Rolbal or for expenses of Rolbal paid by him. We think that Lowy has failed to sustain the burden of showing that the Commissioner's determination is not correct. Lowy has not shown that he made loans to Rolbal of the amounts received from the sale of the stock bearings during the years 1938 through 1943. The sales were made under Lowy's name, but there is no evidence other than Lowy's own testimony, that the proceeds from such sales went into Rolbal's bank account. We cannot accept such testimony as proof that Rolbal received the proceeds of the stock bearings sales. Even if Rolbal did actually received such proceeds, there is nothing to show that they were not capital contributions by Lowy, the sole stockholder; for example, Rolbal had no loans payable account with Lowy on its books. Lowy's alternative argument that he spent $174,900 of his own cash for various corporate *197 expenses during the taxable years, which amount exceeds the unreported income he is charged with, is also supported only by Lowy's own general self-serving statements which we cannot accept as proof of the expenditures. No documentary evidence of any kind was presented to show that Lowy made such expenditures either from his own funds or Rolbal's. There was in evidence testimony or affidavits from twenty-two of Rolbal's employees to the effect that they received various amounts in cash from Lowy for vacation pay during the years 1941, 1942 and 1943. But this does not prove that Lowy made the vacation payments from his own cash since the employees were unaware of the source of the cash; also it was a practice of Lowy to distribute personally the pay envelopes to Rolbal's employees and thus the source of the cash could as easily have been Rolbal as Lowy. Two of Rolbal's employees testified that they were members of the employees recreation committee and that Lowy gave them about $5,000 in cash in both 1942 and 1943 to pay for various social gatherings held for the employees. They were unaware of the source of the funds and Lowy has failed to show that the money came from his own funds *198 and not Rolbal's. The record does not support a finding that Lowy personally had the sums he claims to have spent for Rolbal's expenses. Lowy sold scrap metal belonging to Rolbal for $14,281.47 in 1942 and $5,079.87 in 1943, which amounts he deposited in his personal bank account but did not include as income in his 1942 and 1943 tax returns. Lowy also wrote checks on Rolbal's bank account in the amount of $5,931.71 (not $7,426.71 as determined by the Commissioner) in 1942 and $6,686.90 in 1943, which checks were used to purchase jewelry, furs, and other personal items for himself and Evelyn or were deposited in his personal bank account, but were not included as income in his 1942 and 1943 tax returns. Lowy argues, as above, that these amounts are not income but are merely reimbursements for loans or corporate expenses. For the reasons mentioned above we hold that Lowy has failed to show that these amounts are not properly includible in his income for the years 1942 and 1943. The Commissioner determined that Lowy made personal loans to the Candida Press with Rolbal's funds in the amounts of $2,588 in 1942 and $9,721 in 1943, and therefore received income in those amounts in those *199 years. We have found as a fact that Rolbal, not Lowy, made the loans to Candida. However in 1943 Candida repaid Lowy $6,600 of the amount borrowed, which Lowy deposited in his personal bank account and did not report as income in his tax return. To that extent we hold that Lowy received income as a result of the Candida loans. For the reasons stated above the $6,600 cannot be considered a reimbursement to Lowy for his alleged loans to Rolbal or for Rolbal's expenses allegedly paid by him from his own funds. Lowy introduced no evidence to show that the Commissioner's determinations (set out in the Findings of Fact) relating to "social security taxes deducted from employees not recorded on corporate books," "exchange check to United Airlines charged to expense," "repayment of loans from Paragon Trading Corporation incorrectly credited to cash funds account on corporate records," and "erroneous 1942 corporate expense accrual received in 1943," were improper. Rather he argues that he doesn't understand the Commissioner's determination and that he should not be a mind reader or have to solve difficult riddles in order to interpret the deficiency notice. We can accord this argument no *200 weight. We hold that the petitioner has failed to sustain his burden of proving that the Commissioner's determination relating to the above mentioned items is incorrect. Lowy also introduced no evidence in reference to the Commissioner's determination that he received interest income from his savings account in the amounts of $9.51 in 1942 and $38.13 in 1943 and therefore we must sustain the Commissioner's determination in this respect. There remains the question whether the deficiencies for 1942 and 1943 determined by the Commissioner were due, at least in some part, to fraud with intent to evade tax. We have set forth at length in our findings of fact a list of purchases made by Lowy, or with his knowledge, which were for the benefit of Lowy, his wife Evelyn, or their home. These purchases were paid for from Rolbal's funds and were charged to various business accounts of the corporation. It was shown that the stubs of the checks drawn to pay for some of these items were filled in to make it appear that the disbursements were for business purposes. This was done by Lowy or under his direction. It was also shown that Lowy did not include the amount of these purchases in his income *201 for 1942 and 1943. Lowy sold scrap metal belonging to Rolbal in 1942 and 1943 and retained the proceeds, but did not report them in his income tax returns for those years. Rolbal made loans to Candida which it charged to printing expense and in 1943 Candida repaid Lowy for part of the loans. He deposited the repayments in his personal bank account but did not report that amount as income. Lowy's explanation was that the purchases made by Rolbal on his behalf, and the proceeds of the scrap sales and loans which he received, were simply reimbursements to him for Rolbal's obligations to him. While the burden of proving fraud is upon the Commissioner, and such proof must be by clear and convincing evidence, in deciding whether or not the Commissioner has established fraud on the part of the petitioner, we may consider the entire record properly before us, and are not limited by the Commissioner's affirmative evidence on the fraud issue. ; . The record establishes a pattern of activities on Lowy's part which indicates that he knowingly, with intent to evade taxes, omitted from his income in *202 1942 and 1943, certain corporate distributions to him and other items of income to him. We hold that the deficiencies in Lowy's income tax for 1942 and 1943 were in part due to fraud with intent to evade tax. Decision will be entered under Rule 50. Footnotes
1. Rolbal's check for $6,200, payable to "Geo. Harris, Inc." was originally drawn for payment, but this was not acceptable to the jeweler.↩